UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

GARY WATSKY,

      Plaintiff,

v.                                      CIVIL ACTION NO. 1:21-cv-374

WILLIAMSON COUNTY, TEXAS

AND

                                           JURY DEMAND

ROBERT CHODY, former Williamson
County Sheriff; MARK LUERA, former
Williamson County Lieutenant; STEVE
DEATON, former Williamson County
Commander; AND UNKNOWN
WILLIAMSON COUNTY DEPUTIES,
in their official and individual
capacities

      Defendants.

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Gary Watsky, Plaintiff, by and through his attorneys, Lamar Treadwell, and

the Smith and Vinson Law Firm, PLLC (Jarrod Smith and Brad Vinson), brings this

action for the violations of his civil and constitutional rights, and for his personal

injury and property damage, proximately caused by Williamson County, a Texas

governmental entity, acting by and through its former Sheriff, Robert Chody, and

supervisory defendants, Mark Luera, former Williamson County Lieutenant, and

Steve Deaton, former Williamson County Commander, that were responsible for  the

enforcement of the policy of reckless indifference, including by failing to properly train, supervise, and discipline deputies, including for violations of well-established laws and civil rights pursuant to Title 42 U.S.C. § 1983, Title 18 U.S.C. § 242, Title 28 U.S.C. § 1331, Title 28 U.S.C. § 1343, and the Fourth and Fourteenth Amendments to the United States Constitution, and those unnamed deputies that participated in violating well-established law in compliance with the policy of reckless indifference.

## Summary of the Case

Sheriff Robert Chody was a delegated policymaker for Williamson County who created a culture of indifference to the use of excessive force and disregard for civil liberties by his lack of training, supervision, and discipline that Williamson County adopted, ratified, and accepted. That this policy existed is further evidenced by Sheriff Chody's hiring of deputies with checkered pasts for excessive violence, dishonesty, that also involved the type of disciplinary history that made them unsuitable for hire. To enforce his policy of reckless indifference, Sheriff Chody would retaliate against, including by termination, those deputies unwilling to comply with this policy.  Less experienced deputies, or recent graduates of the academy, lacked proper training, as a newly elected Sheriff Gleason was quoted as saying to the news media about Deputy Pisa. Sheriff Chody, by his leadership, and consistent with his policy of reckless disregard and cultural indifference, would not discipline for excessive use of force, violations of well-established law and protected constitutional civil rights, which they committed while acting in their official capacities and by virtue of authority conferred by law. Sheriff Chody went so far as to create his own

Williamson County Sheriff's Law Enforcement Association, Inc. for the purpose of enforcement of his policy of reckless disregard, including by mass terminations of approximately 200 deputies and personnel, as well as to counter resistance from deputies choosing to belong to the established Williamson County Deputies Association formed over 20 years ago with 300 members. Sheriff Chody fired WCDA President Brian Johns who had accused Chody of theft and abuse of his official powers.

Notably, this policy of cultural indifference to the constitutional protections of Williamson County residents was brought to light through the performance by Sheriff Chody and Williamson County of the television entertaining contract with Big Fish Entertainment, LLC of New York. The "Live PD" episodes alerted the local news media to document and investigate the pattern of complaints of repeated violations of well-established laws and civil liberties. This *proprietary* non-governmental contract allowed Big Fish to film the law enforcement activities of the Sheriff's Department. Those activities were televised nationally on the A & E entertainment program called, "Live PD." But coincidentally, the aired episodes just so happened to document the commission of the Sheriff's well-established policy of reckless and excessive risks to the health and safety of Williamson County citizens. In furtherance of this policy, Sheriff Chody had a custom of ignoring the excessive use of force and constitutional violations by rewarding the bad behavior of his deputies with "gift cards", appearances on "Live PD", and no discipline for constitutional violations. The policy of reckless disregard for the excessive use of force resulted in the unjustified

warrantless entry for search and seizure of the Plaintiff's residence that injured him and destroyed his property. That event was created solely for television and did not result in any discipline.

Moreover, Sheriff Chody and his deputies used false pretenses to justify excessive use of force. When any abuse of the police power resulted in a complaint or investigation, Sheriff Chody would use his official position to conceal evidence of the constitutional violations of well-established law, therefore, obstructing justice. Sheriff Chody and Jason Nassour, an attorney acting as general counsel for Williamson County, were indicted for obstruction of justice.

The public's awareness of the abuses of power led to Sheriff Chody's defeat in the 2020 election and the filing of numerous lawsuits, including for wrongful death. These violations of the oath of office occurred because the Sheriff and his deputies, always acting under the color of state law, were further encouraged by Sheriff Chody's policies and customs to commit crimes when they saw themselves as actors for entertainment on this television series. Various deputies basked in the limelight of the accolades that come with the fame and status of aspiring celebrities, which in turn provided further motivation to create and sustain the false narratives necessary to maintain the high level of theatre-tv-drama for ratings for Big Fish and its advertisers. One or more theatres in the Georgetown area would air the latest A & E televised episode in the ongoing series on their big screens, for which Sheriff Chody and his deputies would tweet out invites.

When Williamson County renewed the Big Fish contract, that act further ratified their approval of Sheriff Chody's policy of deliberate indifference to constitutional violations. Williamson County officials were made fully aware rom the "Live PD" events that Sheriff Chody's constitutional violations were exposing its citizens to the danger of increased risk of harm and injury. This state created danger is the obvious consequence of the culture of deliberate indifference to violations of constitutional rights and well-established law. The "Live PD", television series documented that the Williamson County policy of culture of indifference was the moving force behind the violations of Plaintiff's constitutional rights. This policy also threatened the lives and security of all Williamson County citizens, particularly for entertainment value.

## A. Parties and Service

1. Plaintiff GARY WATSKY is a citizen of the United States of America, and is a citizen and resident of Williamson County, Texas. At all relevant times, Plaintiff Gary Watsky resided in Williamson County, Texas.

2. Defendant, WILLIAMSON COUNTY, is a governmental entity in Texas. It may be served through its County Judge Bill Gravell, Jr., at 710 S., Main St., #101, Georgetown, Texas 78262.

3. Defendant, ROBERT CHODY, at all relevant times herein, was the elected Sheriff of Williamson County Sheriff's Department. He is a resident of Williamson County, Texas. He is sued in his official as well as in his individual capacity. He may be served wherever he is found in Williamson County.

4.  Defendant, STEVE DEATON, is a former Williamson County Texas Sheriff's Department Commander who was a supervisor, and either a participant or bystander defendant. He may be served wherever he is found in Williamson County.

5.  Defendant, MARK LUERA, is a former Williamson County Sheriff's Department Lieutenant, who was a supervisor and participant defendant. He may be served wherever he is found in Williamson County.

6.  The Defendants, UNKNOWN DEPUTIES, are individuals residing in Williamson County, Texas. Without discovery, they cannot be identified nor can their participation as supervisors, participants, or bystanders be determined without discovery. Upon information and belief, and subject to further discovery, at least ten Sheriff's deputies conducted the warrantless entry and search of the Plaintiff's home.

7.  Based on information and belief, and subject to further discovery, the unknown Defendants can be easily and immediately identified and named from Williamson County Sheriff's Office records. These records have been unlawfully withheld following a denial of production pursuant to a public information request regarding these unknown defendants sent on March 17, 2021.

## B. Jurisdiction

8.  This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because the Plaintiff is suing for relief under 42 U.S.C. § 1983.

9.  This Court has supplemental jurisdiction of the Texas constitutional state law claims pursuant to 28 U.S.C. § 1367.

## C. Venue

10. Venue is proper in the Western District pursuant to 28 U.S.C. § 1391 because the Defendants reside in the Western District of Texas, and all or a substantial part of the causes of action occurred in the Western District of Texas.

## D. General Factual Background and Allegations

### i. Policymakers and Supervisors

11. Sheriff Chody was chief or final policymaker for Section 1983 liability of Williamson County law enforcement.

12. Williamson County, acting by and through its Commissioner's Court, delegated to Sheriff Chody policy-making authority.

13. Deputy Steve Deaton held the rank of Commander in the Williamson County Sheriff's Department and was delegated supervisory or training duties.

14. Deputy Mark Luera held the rank of Lieutenant and had the supervisory authority to command the raid and warrantless entry and search of the Plaintiff's residence on May 2, 2019.

### ii. The Warrantless No-Knock, Flash-Bang, Home-Invasion.

15. On the evening of May 2, 2019, under the direction of Sheriff Chody, and command of Lt. Luera, at least ten deputies broke down the ornate front door and the back door of Gary Watsky's residence, destroying both doors.

16. This unlawful no-knock home-invasion occurred without proper cause or warrant at around 7 p.m. when Gary Watsky had a constitutional right to be safe and free from risk of harm by a warrantless entry and search of his residence.

17. Consistent with the policy of reckless disregard for the protection of civil rights guaranteed by the Fourth Amendment and as applied to the states through the Fourteenth Amendment to the United States Constitution, Sheriff Chody's policy of reckless disregard was evidenced when it was broadcast on "Live PD" for all to see, including the Williamson County policymakers comprised of its County Judge, County Attorney, and County Commissioners.

18. This constitutional violation that involved the taking of property by damage and destruction was captured by Big Fish cameras recording the flash-bang grenade attack of the SWAT-clad defendants breaking down the front door, yelling, guns pointing, then engaging in a search of the premises including with a K9 dog.

19. After being assaulted at gun point, and bodily searched, Gary Watsky was eventually allowed outside where he saw Cedar Park police cars, Sheriff's cars, firetrucks, EMS, and yes, SWAT tanks lining his street with his neighbors looking on in horror from their front yards.

20. At this time, the Plaintiff suffered a panic attack, and humiliation.

21. A neighbor approached and stated to Plaintiff "You know, your son's arrest is on national TV on a show called, "Live PD". At that time, Plaintiff noticed the TV cameramen following a deputy.

22. Big Fish had no permission to trespass and film on the Plaintiff's property.

23. The Sheriff and Williamson County Sheriff's Office slandered Plaintiff on national television when they implicated that the Plaintiff was involved in criminal

activity, or was a criminal, because something he did caused the Sheriff to terrorize his family with a military-type heavy weapons assault.

24. Lt. Luera and his deputies never announced their presence at the Plaintiff's residence before they battered down and destroyed both the front and back doors to Plaintiff's residence.

25. After the no-knock entry, Lt. Luera and his deputies, one or more with a K-9 dog, and while pointing assault rifles at the Plaintiff, ransacked his house and even the attic was searched, all without a warrant.

26. The damage to the house is not less than $5,000.00. *See* photos of the damage. See **Exhibit 1.**

27. Sheriff Chody incentivized his supervisors and deputies to engage in this reckless disregard of well-established law by giving "gift cards."

28. Sheriff Chody's reckless disregard policy and customs also encouraged those deputies willing to use excessive force and unconstitutional conduct that deprived citizens of their constitutionally protected civil rights, by giving the deputies the reward of the opportunity to appear on "Live PD" to be portrayed as heroes, which was celebrity-type payoff for him and his deputies.

### iii. The Court Proceedings Earlier in the Day of May 2, 2019.

29. On May 2, 2019, just hours prior to this warrantless entry, Gary Watsky's son, Asher Watsky, who was represented by counsel, personally appeared before Judge Donna King in the 26th District Courtroom in Cause No. 18-2028-K26, and at the time his pending criminal case was reset to June 6, 2019. *See* **Exhibit 2.**

30. Just before Asher Watsky's appearance before Judge King, Sheriff Chody ordered, and upon information and belief, subject to discovery, Commander Deaton carried out that order to remove an outstanding capias (or to render it inactive) from the judicial system's computer; otherwise, the computer system would have timely alerted Judge King about the alleged outstanding capias.

31. And, if necessary, any arrest of Asher Watsky could have peaceably taken place at that time, in a safe environment and with low risk of harm or injury, however, that procedure would have been contrary to Sheriff Chody's policy of reckless indifference and custom to orchestrate Big Fish "Live PD" events to justify escalating encounters for drama and entertainment purposes.

32. Assistant District Attorney, Natalie McKinnon, who was prosecuting Asher Watsky, was also not aware of any outstanding capias due to Sheriff Chody's policy of reckless indifference.

33. Had Natalie McKinnon been aware of the alleged outstanding capias while Asher Watsky was appearing in court on May 2, 2019, she would have cooperated with Asher's defense counsel that were present, to accept service of the capias and arrange for Asher Watsky's peaceful appearance and the conditions of release at that time.

34. The outstanding capias for Asher Watsky's arrest was based on alleged events occurring on September 4, 2018.

35. Since the time of his arrest and release, Asher Watsky had passed seven months of drug tests.

36. The alleged capias was filed in the 26th District Court of Williamson County, Texas on April 17, 2019 by an unknown person.

37. **District Attorney Shawn Dick** stated on July 23, 2020 in an interview with KVUE television reporter, Tony Plohetski, that he and others wondered why the deputies didn't arrest Asher Watsky when he came to court as they routinely do with other defendants. *See* the seven-minute KVUE television broadcast online article:

> https://www.kvue.com/article/news/local/williamson-county/live-pd-williamson-county-sheriffs-office-raid-cedar-park-robert-chody/269-407e78f8-c9e1-4d40-a04c-cea98a36099b

38. **At this interview, Shawn Dick was reported to have said:** He inquired about the incident at the time and that Sheriff's officials acknowledged removing the capias from the system so no one would see it that day.

39. In the July 23, 2020 report, KVUE reporter Tony Plohetski article further claimed that, "Three former Williamson County investigators with the Sheriff's office, who are no longer with the agency, say that was not unusual days before "Live PD" tapings for supervisors to ask them to move forward with getting warrants for suspects who could be arrested on the show."

40. This procedure was consistent with Sheriff Chody's policy of reckless indifference to create false narratives to justify the deprivations of constitutionally guaranteed rights including the excessive use of force.

41. Consistent with reckless disregard for the safety and risk of harm to citizens of Williamson County, Sheriff Chody set up a false narrative for "Live PD" that Asher Watsky was dangerous, or a drug dealer-type person, to justify the SWAT team's

terror tactics and K-9 search – not for public safety – but only for the proprietary interests of commercial television. Therefore, this event was planned to ignore the May 2, 2019 court hearing opportunity for a peaceable arrest.

42. Further, reporter Tony Plohetski stated, in his July 23, 2020 article:

> "The May 2, 2019, arrest places new scrutiny on an agency already facing questions about its tactics and what some complain are overly aggressive law enforcement actions during what experts say should have been peaceful, non-confrontational encounters."

43. Plohetski's article names an expert and quotes his opinion about the Watksy "raid."

> "National law enforcement consultant Jeff Noble said police agencies rarely rely on the same tactics deputies used in Asher Watsky's arrest and often consider them dangerous to officers, the public and suspects themselves.
>
> That is not the type of situation to take lightly but, at the same time, it is not the type of situation I would expect a SWAT team to enter a home to make an arrest," Noble said.
>
> Noble said he, too, is left with the same concern: "That this was staged for the value of live television."

### iv. Williamson County's reckless disregard policy, practice, and custom of using excessive force and ignoring well-established law and protections of constitutional rights.

44. Williamson County created a culture of indifference to constitutional violations by encouraging and providing rewards for excessive use of force and deprivations of civil rights by the following policies, practices, and customs:

    a. Refusing to hold deputies accountable by the implementation and use of standard disciplinary procedures for committing assault, battery, damage to property, warrantless arrests, entries and searches and seizures, conduct unbecoming of an officer, obstructing justice, and ethics violations, including for dishonesty.

b.  Refusing to provide adequate training or supervision for trained deputies to reduce the risk of exposure to violations of safety and injury or harm due to violations of well-established law.

c.  Ignoring proper procedures for not firing deputies with histories for terminations for violations of well-established law, dishonesty, including for excessive use of force or deprivations of civil liberties.

d.  Rewarding deputies willing to engage in reckless conduct with gift cards, appearances on the Big Fish "Live PD" show and the tag of "Wilco Badass."

e.  Providing inadequate training.

f.  Interfering with the office of professional conduct to properly investigate and hold accountable deputies for violations of well-established law.

g.  Allowing and ratifying the Sheriff Department's performance of the Big Fish contract to take precedence over public safety to the point where that enhanced and encouraged Sheriff Chody's policy of reckless indifference, which increased the risk of harm and injury to Williamson County citizens.

**v. Historical evidence of the reckless disregard policy.**

45. <u>Chody's 1998 Austin PD use of excessive force resulting in liability</u>. In 1998, Sheriff Chody was an Austin Police Department officer.

46. On August 28, 1998, Robert Chody used excessive force on a 15-year-old boy by forcing him into a chokehold and slamming his body against the police vehicle, which immediately and directly caused the boy to suffer an epileptic seizure.

47. **Marcus Frank**, a then 15-year-old boy, did not commit any crime and was not under reasonable suspicion to have committed a crime when Chody chased him down the street and forced him into a chokehold.

48. According to court documents, Chody slammed Fran's face on the hood of the partol car, putting him in a "full-nelson" (a forceful, immobilizing wrestling hold that places pressure on the neck), triggering a seizure and bruising Frank's ribs.

49. Witnesses on scene informed Chody several times that he had detained the wrong person.

50. As Frank suffered the seizure and his convulsing intensified, Chody continued to hold Frank down, and failed to provide necessary emergency assistance.

51. Chody assaulted Frank without any apparent articulable reasonable suspicion or probable cause.

52. <u>Deadly use of force was responsible for the death of Javier Ambler in April 2019.</u> "Live PD" filming of the Javier Ambler arrest documented that after Ambler was stopped for not diming his headlights, he died after being tased four times.

53. This was a direct and predictable consequence of the policy of reckless indifference, encouraged by Sheriff Chody's reward system of allowing violations of well-established law and proper law enforcement procedures that included being filmed "in-action" on Big Fish "Live PD" for drama and entertainment.

54. Sheriff Chody was indicted for obstruction of justice in hiding the evidence of the Ambler event, as reported by Jason Barr on March 31, 2021 for KXAN (Austin) in its televised news and online article that stated:

> "AUSTIN (KXAN) – Former Williamson County Sheriff Robert Chody has been arrested in Travis County and charged with tampering with evidence, and third-degree felony. This stems from the deadly arrest of Javier Ambler II in March 2019.
>
> It's the second time in six months grand juries in Travis and Williamson Counties have indicted Chody and former Williamson County general counsel Jason Nassour, who worked under County Attorney Dee Hobbs. Nassour turned himself into Travis County Authorities on Wednesday and posted bail."

55. **Scott Lewis.** Upon information and belief on January 25, 2019, WCSO deputies used excessive force against Scott Lewis without legal justification to use excessive force pursuant to the Williamson County custom or policy allowing excessive use of force.

56. **Imani Nembhard.** In April of 2019, Imani Nembhard was assaulted by WCSO deputy Christopher Pisa.

57. Deputy Christopher Pisa was criminally charged in early 2019 with official oppression and bodily injury in Williamson County Cause No. 20-1582-K26 arising out of the traffic stop of the 29-year-old U.S. Army Veteran for a missing front license plate that occurred with her children witnessing the assault.

58. In a Texas Ranger interview, Deputy Pisa is alleged to have told them that his bosses would reward him for excessive use of force with gift cards.

59. Consistent with the policy of reckless disregard, two of WCSO's supervisors cleared Pisa of wrongdoing in April of 2019.

60. Upon information and belief, and subject to confirmation by discovery, including official records that have been unlawfully withheld by newly elected Sheriff Gleason, Gleason has admitted that Pisa was poorly trained, worked in a culture of violence where violence was used for entertainment.

61. Nembhard sued Williamson County, former Sheriff Chody and deputy Pisa in the Western U.S. District Court for Texas in Cause No. 1:21-cv-00350-RP on April 21, 2021.

62. **Spencer Murphy.** On April 10, 2019, no WCSO deputies were disciplined for using excessive force without legal justification when they confronted Spencer Murphy. Although deputy Lorenzo Hernandez was removed as a field training officer due to this incident, he was later rewarded by being made a detective.

63. A KVUE report that aired on September 3, 2020 documented an excessive use of force by Deputy Lorenzo Hernandez that occurred in early 2019, and was also investigation, as documented at:

https://www.youtube.com/watch?v=JUXbiT3jWKs

64. **Charles Thornburg** sued Williamson County, Sheriff Chody and several deputies in the U.S. District Court, Western District of Texas, Austin Division in Civil Cause No. 1:21-CV-00172 alleging serious injuries inflicted from excessive use of force on February 24, 2019 from a TASER, being hit at close range with a shotgun bean bag round, and repeated biting by a K-9 of his penis, testicles and stomach, while fully complying with deputies' requests – in his pajamas – resulting in broken bones requiring surgery and hospitalization.

65. **Archie Shirley III.** On May 16, 2019, Archie Shirley appeared in court for a previous misdemeanor charge. Where he could have been arrested for a new warrant safely at the courthouse, WCSO deputies instead chose to save his arrest for TV, and waited for him to return home to his mother's house. The Sheriff's command ordered the court bailiff not to arrest Shirley at the courthouse so that he could be arrested on "Live PD" with a SWAT raid at his mother's house, where she claimed a deputy put a gun to a ten-month-old baby's head.

66. Media Investigations. Upon information and belief, and subject to discovery, the Austin American Statesman analyzed 124 use of force reports from 2017 to 2019 (Sheriff Chody's term of office) and found that in three years, supervisors only found two violations.

### vi. Williamson County, the policymaker, has an official policy procedure and custom that is the moving force for violations of constitutional rights.

67. Proper law enforcement policies, procedures and customs teach de-escalation of an incident, rather than incitement and escalation, as Sheriff Chody required pursuant to his, the WCSO's and Williamson County's policy of reckless disregard, that instead **incited, encouraged and rewarded** violations of well-established law and constitutional violations.

68. One obvious encouragement that came to light was the reward of appearing on an episode of Big Fish's "Live PD" along with getting a "gift card" and being known as a "Wilco Badass", plus the personal reward of being featured as a hero on TV.

69. Williamson County's acceptance of and entry into the Big Fish entertainment contract was an affirmative action, as a policymaker, that put into public view the well-established policy of reckless disregard for the violations of constitutional rights, such that it was an accurate representation of the policy of Williamson County.

70. Although Williamson County was aware of a pattern of complaints about its policy, it chose to disregard those complaints and continue to ratify its policy of violating constitutional rights by renewing the Big Fish contract.

71. The renewal of the Big Fish contract was done with deliberate indifference to the obvious consequences that constitutional violations would continue to occur.

72. News media investigative reporting highlighted the pattern of citizen complaints arising from the lack of training, supervision, and failures to discipline or investigate complaints such that Williamson County's policy of reckless disregard was the moving force of the violations.

73. Williamson County failed to direct the WCSO to protect its citizens by failing to remove them from the increased risk of harm and injury the WCSO itself created through its choice to continuously adopt and implement its policy of reckless disregard by not cancelling the Big Fish contract.

74. Discovery of WCSO's records is expected to establish which officers were involved in the May 2, 2019 Watsky incidents, i.e., who participated in creating the capias, who participated in its removal from the computer system, who was willfully blind to the capias at the time Asher Watsky was in the courtroom, and who planned the raid, and participated in the violent raid at Plaintiff's residence – for TV entertainment purposes.

75. Discovery will determine if Cmdr. Steve Deaton rewarded the deputies who performed for the cameras at the Watsky residence.

76. Discovery will determine whether those present had deficient training, thus encouraging the use of force as well as encouraging ignorance and the willful ignoring of well-established law concerning how and when a warrantless search may be made.

In this immediate case, Asher Watsky was not a fugitive, was not armed, and was not dangerous when he was in the courtroom earlier on May 2, 2019.

77. Upon information and belief, and subject to discovery, particularly from the record being withheld by the WCSO, the use of force reports will show that deputies hired under Sheriff Chody were involved in most of the excessive use of force reported incidents, lacked training, and had public histories of complaints.

78. Finally, because of the awareness of the rising pattern of complaints and news media investigative reports, particularly what occurred for the televised home-invasion of the Watsky residence, on May 19, 2020, Williamson County sued Sheriff Chody alleging that,

> "Blinded by the TV lights, Sheriff Chody has lost sight of his core duties as Sheriff of Williamson County. His job is Sheriff, not TV producer, reality TV star or show business agent."

79. The Sheriff's Office has refused to timely produce records of material facts that will confirm that District Attorney Dick's office has investigated at least five Sheriff's Office use of force encounters that would also likely identify the unknown deputies in the Watsky home-raid. The withheld records will also supply material facts of the pre-text warrantless search to justify the misuse of the police power to commit assault, battery, slander of the Plaintiff, and the taking of his property by destroying it on May 2, 2019.

80. All unknown Defendants, and Lt. Luera, were employed as Sheriff's deputies and took part in the May 2, 2019 raid on the Plaintiff's home.

81. Consistent with the policy of reckless indifference, Cmdr. Deaton planned the Watsky raid to escalate a peaceful courthouse encounter into a made-for-TV drama.

82. Consistent with the policy of reckless indifference and the rewards, Lt. Luera led the warrantless SWAT raid on Plaintiff and his property, and while being filmed riding on the back of the military SWAT vehicle – falsely claimed Asher Watsky was considered "dangerous" to justify a no-knock warrantless and excessive use of force encounter for TV entertainment.

83. Upon information and belief, when Lt. Mark Luera was about to be terminated from the Austin Police Department, Sheriff Chody hired him for his propensity to use excessive force and to violate well-established law to create drama for "Live PD."

84. Cmdr. Steve Deaton played a behind-the-scenes "Live PD" role, to coordinate and select incidents for filming, including the Watsky house-invasion.

85. Cmdr. Deaton had been previously disciplined while working as an Austin police officer for making inappropriate comments about another officer and leaving his badge and gun in a Target shopping cart.

86. A reporter for the Austin Statesman, in a September 3, 2019 4:07 p.m. article, updated on September 4, 2019, at 6:03 a.m., stated the following:

  a. "In April, Deaton also was the subject of a complaint by a Georgetown attorney who alleged that Deaton challenged deputies in a meeting to have sex with the female producer of the "Live PD" TV show."

  b. "Several public officials, including County Judge Bill Gravell, had called on Deaton to resign for postings he had put on his public Facebook page

making light of date rape, kidnapping and the amputation of a black football player."

c. "During a workshop on August 15, on the Williamson County budget, Gravell said of Deaton, "You are an embarrassment to Williamson County and you are a disgrace to our Sheriff."

"I am calling on Cmdr. Steve Deaton, if you have any semblance of integrity left, to resign and step down."  Gravell said.

d. "Round Rock – Williamson County Sheriff's Cmdr. Steve Deaton, who faced criticism for his controversial Facebook posts, resigned Monday, the Sheriff's office said Tuesday."

87. At the November 2020 elections, Mike Gleason was elected Sheriff.

88. Gleason was Williamson County's first Democrat to hold countywide office in nearly 30 years.

89. Sheriff Gleason stated he asked the entire command staff under Chody to leave, which he said was necessary to rebuild community trust.

90. Lt. Mark Luera resigned as part of the transition.

91. Lt. Luera had a history of prior bad conduct, summarized by Austin Police Chief Brian Manly when he stated: "his dishonest statements during the criminal investigation [i.e., of himself] will compromise his credibility as a witness if he continues to serve as a police officer."

92. Sheriff Chody made Luera a lieutenant in charge of training.

93. At all times, Sheriff Chody was not only a supervisor, he was an elected official, and the policymaker responsible for the policies and procedures of the Sheriff's

Department, and its general and special orders as well as their implementation and compliance, that included proper hiring, training, supervision, and discipline, not only of himself but of his deputies.

94. Cmdr. Deaton misused his supervisory and training duties in the Sheriff's office to adhere to and enforce Williamson County's reckless indifference policy.

95. Lt. Luera was a supervisor who was responsible for adhering to Sheriff Chody's "Live PD" ad-hoc filming policies and as a reward and encouragement for all deputies to violate constitutional rights to appear on "Live PD."

96. Thus, at least ten deputies were rewarded to be on the "Live PD" Watsky home-raid, including a K-9.

97. Sheriff Chody and his deputies violated their oaths of office to uphold the constitution and to protect public safety when they purposefully delayed Asher Watsky's arrest so he and his deputies could be filmed in an exciting and violent scene for "Live PD."

98. It was a violation of their oath of office for Sheriff Chody and his deputies to contract to act as agents and actors for Big Fish Entertainment because their TV appearances were not for the benefit of general public safety, but rather for their own personal benefit, and were therefore conducting themselves in a *proprietary*, non-governmental capacity, (i.e., stimulating ratings and profits for Big Fish, garnering celebrity status and receiving rewards, tangible or intangible, or other types of benefits for themselves), which at all times was within the scope of their employment and under the color of law.

99. The Big Fish access contract served no governmental function at the time it was entered into by Sheriff Chody and Williamson County, but was an official act in furtherance of the policy or reckless disregard.

100. At all times, Sheriff Chody and his deputies knew they were under a duty to not violate their oath of office nor to engage in any violation of well-established law, including deprivations of civil rights and liberties, including by denial of due process guaranties of the Fourth and Fourteenth Amendments to the United States Constitution. *See* **Exhibit 3** (Oath of Office form)

101. Despite being informed of the rising pattern of complaints about their unlawful conduct, including abuse of police power by excessive use of force, neither Sheriff Chody, nor his supervisors, or Williamson County took steps to timely or properly discipline their Sheriff Department employees before the events of May 2, 2019.

102. This lack of propriety to property train, supervise and discipline the Sheriff's deputies created and fostered a climate and culture of indifference to civil rights of this Plaintiff.

103. The specific activities of these Defendants, who were present at the Plaintiff's residence on May 2, 2019, is not entirely known, because the current Williamson County Sheriff's Office, under Sheriff Gleason, has refused to provide public information it holds in its records about the events of May 2, 2019.

104. Upon information and belief, Big Fish and the Sheriff's Department had previously been uncooperative with the Williamson County District Attorney's requests to turn over film of numerous crash and bashes, and uses of excessive force,

thus obstructing the District Attorney's capability to prosecute the *alleged* crimes aired by Big Fish; as such, Big Fish has knowledge of material fact about the May 2, 2019 home-invasion.

### vii. The Big Fish Entertainment, LLC "Access Agreement"

105. Big Fish Entertainment, LLC ("Big Fish") produced a reality television program titled "Live PD."

106. As part of the program, Life PD producers and camera operators ride along with law enforcement officers.

107. The Williamson County Sheriff's Office, ("WCSO"), was often featured on "Live PD" along with former Sheriff Robert Chody.

108. Sheriff Chody, Williamson County and Big Fish – as the Producer – entered into a written contract on January 16, 2019 to ". . . place all necessary personnel, facilities, vehicles and equipment on WCSO property . . . [including] for still photography or other activity required in connection with the production, promotion or other exploitation of the TV series. **Exhibit 4 ¶ 2.**

109. Because the public has a right to know the activities of its government officials, the Big Fish "Access Agreement" contract is a public document.

110. Further, that contract provided:

> ". . . Producer agrees to accord WCSO an on-screen credit in substantially the form "Special Thanks to Williamson County Sheriff's Office" in accordance with the Network's then-current credit policies, for all Series episodes in which WCSO personnel and activities are depicted." *See* **Exhibit 4 ¶ 7.**

111. The Big Fish contract avers that it does not create any agency or employment relationship between Big Fish, the WCSO Sheriff or its deputies. Nonetheless, the agreement intended that Big Fish would make ". . . creative or logistical requests . . ." upon the WCSO and therefore, WCSO contractually agreed to accommodate those requests.

112. **The contract with Big Fish was a proprietary undertaking.** Pursuant to the terms of the "Live PD" "Access Agreement," it was a *proprietary* non-governmental undertaking by Williamson County and the WCSO. This contract was commercial in nature. It was chiefly for the advantage of and benefit of the WCSO and Williamson County, and not the welfare, safety or benefit of the public. Therefore, it had the effect of jeopardizing the *public's trust and confidence* in the Williamson County government's functions as evidence in party, – by numerous news reports, numerous excessive use of force lawsuits. This lack of confidence was at issue in the election of a new Sheriff, who after being elected, terminated Chody's deputies. Before the election, Williamson County had sued Sheriff Chody over his conduct.

113. Therefore, the Big Fish contract is more evidence of the intent and awareness to engage in a policy of reckless indifference, and as such was done with deliberate indifference to the obvious consequences that would arise in time over the constitutional violations.

114. Despite being made aware of the consequences of its policy of reckless disregard, Williamson Count only acted when it started being sued for such conduct

and excoriated in repeated televised investigative reporting of the abuses of the police power resulting from its reckless indifference policy, procedures and customs.

115. Under the Big Fish contract, Williamson County agreed to the broadest indemnification of itself and its employees, including those of the Sheriff's department, from liability arising out of third-party claims. That indemnification was a benefit and incentive for the WCSO and Williamson County to continue to enforce and encourage its policy of reckless disregard.

116. Due to the presence of Big Fish and its ability to make "creative logical requests" to garner TV ratings for its advertisers, it was not only a commercial venture starring the Sheriff and his deputies, but was an excuse for Williamson County to continue to use the TV episodes to justify its reckless indifference policy that allowed the dishonest use of false pretenses to escalate confrontations under color of law.

117. As the Sheriff, and WCSO policymaker, Robert Chody himself exhibited, and under the color of law, instituted, condoned and established a policy and a pattern of using excessive force, along with denial of constitutional due process.

118. Delaying an arrest for the purpose of televising riot-clad deputies conducting a home-invasion created an unreasonably dangerous condition to the Plaintiff, the public, and other who were present.

119. Robert Chody's long-term historical conduct reflects his desire to escalate non-violent situations into dangerous ones to justify his use of excessive force that, in this case, was not necessary to achieve a peaceable arrest in the courtroom.

### viii. State created danger.

120. **Actual knowledge of the risk.** Sheriff Chody's arbitrary and unprofessional conduct, and his unnecessary escalation of force became a policy and practice that centered around the performance of the Big Fish "Access Agreement."

121. Sheriff Chody and Williamson County were aware of the "Access Agreement" because they were parties to it.

122. Prior to May 2, 2019 Sheriff Chody and Williamson County were aware of a series of complaints brought by people who were injured in the filming of the "Live PD" series, including by WCSO whistleblowers, that resulted in news media coverage of the excessive use of force and violation of civil liberties.

123. **The risk of increased harm or of injury was the result of Williamson County's policy.** Although the performance of the Big Fish Contract was a *proprietary*, non-governmental endeavor, it nonetheless created and proximately caused circumstances of danger and dangerous activities that created an increased risk of harm or injury to the citizens of Williamson County.

124. The state created danger of increased risk was the direct result of a policy of reckless indifference used for escalating encounters of minor violations of law, or of confrontations with innocent persons, used to justify detention, custody, unlawful search or seizure, and the excessive use of force under false pretenses, and by ignoring well-established law prohibiting warrantless arrests, warrantless searches, assault, battery, and deprivations of life, liberty and property and without due process of law.

125. Wherever and whenever the combination of WCSO deputies and Big Fish cameramen occurred during filming in Williamson County – that event created an increased zone of excessive risk of personal injury or denial of civil liberties to the person subjected to a detention, arrest, search or other police procedure.

126. **The increased risk to the Plaintiff was disregarded with deliberate indifference to his personal health and safety.** Plaintiff's interest in his personal safety and the safety of his home was violated when Williamson County, the WCSO, and its policymaker Sheriff Chody, by and through their affirmative actions, placed the Plaintiff in a danger that he would not have otherwise faced, and failed to protect him from that danger.

127. If Plaintiff's son Asher Watsky was a danger, as Defendants falsely alleged, then these Defendants enhanced that danger when they 1) removed the capias from view of the assistant District Attorney and Judge King, and 2) did not take him safely into custody at that time, but delayed for their own purposes.

128. Sheriff Chody and the unnamed deputy Defendants deliberately chose to pass up a safe non-violent interaction with Asher Watsky in the courthouse – with plenty of security – to create a zone of excessive risk to the health and safety of an innocent citizen for a televised event.

129. A no-knock warrantless entry home-invasion, conducted by a heavily armed SWAT team, throwing around explosive flash-band grenades, designed to stun and incapacitate those in the area, accompanied by battering down doors, is an excessive use of force.

130. Therefore, this type of entry into the Plaintiff's house and then ransacking it along with a roving aggressive K-9 – was a practice that resulted from the reckless indifference policy – that resulted in creating a county-wide danger of increased risk of harm or injury, which occurred to Plaintiff, who was a county citizen.

131. The staging of events for television drama entertainment value, likely resulting in this risk of increased harm, was already known to Sheriff Chody and Williamson County from the prior complaints of excessive use of force that were flowing in, including from "Live PD" encounters and from the death of Ambler and Thornburg's hospitalization.

132. It was already known that "Live PD" was creating a known increased risk of harm to the safety of the citizens of Williamson County when the District Attorney went public concerning the lack of cooperation by Sheriff Chody and Big Fish in turning over evidence needed for criminal prosecutions.

133. Not being able to prosecute those charged with crimes creates an excessive risk to the general public's health, safety, and expectation that the Rule of Law will be enforced.

134. Despite Williamson County being well-aware of its created danger of increased risk of harm or injury to those having the misfortune of being abused in a Big Fish episode, Williamson County and Sheriff Chody acted with deliberate indifference to those increased risks when they chose to renew the Big Fish contract in 2019.

135. Despite the many warning signs of complaints and new media investigative coverage, Sheriff Chody, Lt. Luera and Cmdr. Deaton acted with deliberate

indifference when they removed the capias from the jail-courthouse computer network and refused to peaceably confront Asher Watsky in the courtroom.

136. **42 U.S.C. § 1983 violations.** Certified peace officers are trained to know well-established state law concerning assault, battery, and damage to property, as well as the restraints imposed by constitutional due process.

137. Sheriff Chody, Cmdr. Deaton and Lt. Luera chose to violate their oath of office and the Plaintiff's Fourth and Fourteenth Amendment rights to be free from warrantless seizures and searches, and deprivations of the rights, privileges and immunities thereby granted.

138. **Violations of State law.** Defendants Deaton and Luera, and the unknown Defendants, who were present at the Watsky residence on May 2, 2019, committed assault and battery upon Gary Watsky and took his property by destroying it in violation of the due process guarantees of the Texas Constitution.

**139. Williamson County's admission of its awareness of the state created danger of increased risk of harm or injury and to the safety and health of the Plaintiff.**

140. When the Williamson County Commissioners filed a declaratory action against Sheriff Chody on <u>May 19, 2020</u>, it alleged that the Sheriff's behavior was "unauthorized, ultra vires, and underhanded . . ." (Lawsuit ¶ 46, *County of Williamson v. Robert Chody and Big Fish Entertainment, LLC*) Cause No. 20-0752-C26, in the 26th District Court of Williamson County.

141. The County Commissioner's lawsuit also stated that,

"District Attorney Shawn Dick reiterated that he could not prosecute the criminal cases featured on "Live PD" unless his office was provided with all witness information for each arrest (including names of Live PD crew), as well as the raw, unredacted footage of the arrest captured by Big Fish: . . .

> "If those requests are not met, we will decline/ dismiss the charges." (Lawsuit ¶ 46, quoting an e-mail from District Attorney Shawn Dick to Chody).

142. That lawsuit states that the County Commissioners were unaware that Sheriff Chody may have accepted a "benefit" (i.e., a donation), from Big Fish. (Lawsuit ¶58).

143. Sheriff Chody authorized the use of excessive force by rewarding his deputies with gift cards, special recognition names or monikers, and promotions instead of disciplinary actions.

144. Despite being aware of the increased harm to its citizens from Sheriff Chody's practice and policies of excessive use of force, Williamson County renewed the Big Fish "Access Agreement" on June 4 2019, indicating a ratification of Sheriff Chody's policies.

145. Sheriff Chody's policies allowed deputies to be hired who were unfit because of their prior complaint backgrounds.

146. Sheriff Chody had a custom, practice and policy to improperly hire, train, supervise or discipline deputies. Thus, deputies whose bad conduct met the drama criteria as needed for the "creative and logistical needs" of the Big Fish producers, would be hired.

147. Thus, Sheriff Chody's reckless disregard practice also created celebrity status that publicized his name recognition for a future run for U.S. Congress.

148. Williamson County's lawsuit to enjoin Sheriff Chody's conduct was an admission that his conduct, policies and abuse of the police powers was endangering the citizens of Williamson County, because it alleged:

a. "¶ 27. In reality, Big Fish (a for profit television network based in New York City) was largely concerned with its own profits. Its intent all along was to gain access to Williamson County vehicles, facilities, and employees, and exploit select encounters with Williamson County citizens for ratings and commercial gain."

b. "¶ 35. One such problem was the cases and crimes appearing on "Live PD" were largely ending with dismissals instead of prosecution and convictions."

c. "¶ 37. In addition, to the concerns about the preservation of evidence by Big Fish, safety concerns were raised by Williamson County emergency dispatchers about how they were instructed by Sheriff Chody not to dispatch "Live PD" deputies to nearby calls – even priority calls that were only of interest to Live PD's producers without notifying the dispatcher, thus causing confusion and resulting in multiple deputies responding to relatively minor offenses. Meanwhile, deputies not assigned to "Live PD" patrol cars were left without backup, had to speed across the county, with lights and sirens blaring, to cover priority calls that were refused by "Live PD."

d. "¶ 46. Williamson County accused Sheriff Chody of unauthorized, ultra vires, and underhanded behavior."

e. "¶ 58. Moreover, to the extent Sheriff Chody contends that the County is receiving a benefit from Big Fish without providing anything in return (i.e., a donation), then he also has no authority to accept such benefits."

    f.   "¶ 67. (Request for temporary injunction) Unless a Temporary Injunction is granted, Williamson County will suffer irreparable injury, such as having lost the opportunity to prosecute those serious criminal cases, . . ."

149. Williamson County had sufficient evidence before May 2, 2019 to know that Sheriff Chody's performance of the Big Fish contract was violating its citizens' civil liberties without due process.

150. Williamson County had sufficient evidence before May 2, 2019 to know that it had ratified, condoned and participated in creating a danger to the community because of the excessive use of force policies of Sheriff Chody, and the complaints of the District Attorney that Big Fish and Sheriff Chody were obstructing justice by withholding evidence.

151. Plaintiff, a citizen of Williamson County, had a constitutional right to be protected from increased risk of harm or injury from state actors, and the state actors had a duty to protect him from their constitutional violations.

152. Like throwing someone into a snake pit of vipers, Williamson County's policy or reckless disregard was so egregious and so outrageous that it not only shocks the public's conscience – it must be shocking to the conscience of this court.

153. Sheriff Gleason has refused to provide the Plaintiff access to public records as required by law, including the identities and the body camera footages of all the deputies who participated in the May 2, 2019 home-invasion of Plaintiff.


**Supervisory Defendants.**

154. Sheriff Chody as the leader of the Sheriff's Department was responsible for the lack of training and supervision, that supported and encouraged excessive use of force and violation of civil liberties of life, liberty, and property by denial of constitutional due process, under color of law.

155. Sheriff Chody's policies were carried out by Cmdr. Deaton and Lt. Luera by their use of false pretenses to justify excessive use of force or the denial of due process, in violation of well-established law.

156. These supervisory defendants failed to follow standard law enforcement policies and procedures thereby knowingly creating an increased risk of harm and injury, and then failed to take timely or proper action to protect the Plaintiff from the increased risk of harm, he would not have otherwise face, but for their conduct.

**Unknown Participatory Defendants.**

157. These defendants will be identified when the Plaintiff is able to secure withheld public documents that identify who were the participants in the May 2, 2019 home-invasion, including the evidence on the body camera videos.

**Bystander Defendants.**

158. Upon information and belief, including investigative news reports, WCSO victim complaints and Williamson County personnel whistleblowers will reveal the observed or condoned transgressions of well-established laws and deprivations of civil liberties if not obstructed by official action of the named defendants and Sheriff Gleason.

159. At all relevant times, Sheriff Chody and all defendant deputies are believed to be commissioned law enforcement officers who have received training about well-established laws they are alleged to have violated.

160. At all relevant times, as to their actions described herein, Sheriff Chody and the named and unnamed defendant deputies acted within the scope of their employment under color of law and pursuant to their authorities as certified or deputized law enforcement officers employed by Williamson County.

### xix. Plaintiff's Damages.

161. The Plaintiff suffered assault by a deadly weapon, by battery from concussion, light and noise from flash-band grenades, by unwanted physical contact that immediately caused him to have a "panic attack." Subsequently, the Plaintiff suffers from anxiety attacks that he never suffered before. He is afraid at times in his own home. He suffers from undue stress knowing he can never trust the police or call upon them under duress as he is afraid of them. Plaintiff's doors were destroyed that amounted to a taking of his property resulting in a damage of approximately $5,000.00 to repair or replace.

162. **42 U.S.C. § 1988**. It was necessary for the Plaintiff to hire counsel to represent him. As a prevailing party, Plaintiff is entitled to recover from the Defendants his reasonable attorney's fees and costs as provided for by 42 U.S.C. § 1988 as to each Defendant, jointly or severally.

163. All Exhibits attached hereto are incorporated herein by reference and submitted as corroborating evidence under Fed. R. Evid. 901 (b)(7) (a and b), and the

Court is requested to take judicial notice of the referenced news articles under Fed. R. Evid. 201(b).

### x. Conditions Precedent.

164. All conditions precedent necessary to bringing this cause have occurred, have been performed, or have been waived.

165. As a direct and foreseeable result of the warrantless entry into his home by violent means, and having assault weapons pointed at him, being roughly frisked without his consent, the Plaintiff has suffered mental and emotional anguish for which he has sought professional help.

## CAUSES OF ACTION

### COUNT I.
### Deliberate Indifference and Causes of Action Civil Under
### *Monell v. New York City Department of Civil Services* for violations of the
### Fourth Amendment pursuant to 42 U.S.C. § 1983 against
### Defendant Williamson County

166. The allegations contained in each of the other paragraphs above are hereby incorporated by reference, as a fully set forth herein, and further alleges as follows:

167. The Fourth and Fourteenth Amendments to the United States Constitution prevents the deprivation of life, liberty or property without due process, substantive or procedural.

168. The conduct of Williamson County, its Sheriff, Robert Chody, and his subordinates, identified and unidentified, and as described herein, constituted excessive force in violation of the Fourth Amendment of the United States Constitution, as incorporated and applied through the Fourteenth Amendment.

169. The conduct of Williamson County, its Sheriff, Robert Chody, and his subordinates, identified and unidentified, described herein, each acted under color of state law, and as employees or agents of Williamson County.

170. The conduct of Williamson County, its Sheriff, Robert Chody, and his subordinates, identified and unidentified, described herein, wore their official department uniforms and were acting within the scope and course of their duties as Williamson County deputies at the time they supervised the warrantless search of the Plaintiff's residence, seized, assaulted, and committed an unwanted touching of his person without a warrant, participated in these events, or stood by and observed these events.

171. **Policymaker.** Defendant, Robert Chody, was the chief or final policymaker for all matters related to the activities of the WCSO including all law enforcement activities as the elected Sheriff of Williamson County, Texas, and as delegated to him by Williamson County.

172. Official Policy. As Williamson County has condoned, encouraged, aided, and abetted or ratified the following customs, policies or practices that were in place when Gary Watsky was assaulted, battered, and his property damaged on May 2, 2019, that included:

    a. Williamson County had a policy of reckless indifference as evidence by a rising pattern of victim complaints, news media investigative reporting, and WCSO use of force or violations of well-established law reports, and whistleblowers.

    b. Deliberate indifference is evidenced by Williamson County and Sheriff Chody re-signing the proprietary non-governmental Big Fish "Access Agreement" and

being fully aware that such an agreement was being used by them to plan dramatic events for the show on television, "Live PD," that in turn was used by them to further justify the Williamson County reckless indifference policy that included escalating non-violent, or low level risk of violence situations into escalating situations to use aggressive and violent use of force situations against citizens for "entertainment" purposes.

c. The use of excessive force and constitutional violations involved Sheriff Chody or unidentified others providing incentives for the deputies appearing on "Live PD" to encourage their excessive use of force to commit violations of well-established law, such as assault, battery, damage to property and warrantless searches and seizures.

d. By accommodating the "creative and logistical" requests of Big Fish, Sheriff Chody, by his participation in the direction, planning, and production of each and every episode of "Live PD" encouraged, as his and as Williamson County's policy, the use of excessive force and constitutional violations for the purpose of producing and to continue to participate in dramatic television events.

e. Sheriff Chody encouraged the use of excessive force and constitutional violations by rewarding such conduct with gift cards and showed his approval by calling such actions or deputy actors, "Wilco Badasses" and by granting approval for appearance in a "Live PD" episode.

f. Williamson County and Sheriff Chody established a policy of cultural indifference that was used to justify the escalation between WCSO deputies and citizens that presented either a low-level threat risk, or no threat risk, into a violent use of force event "creatively" staged for "Live PD" that repeatedly caused unnecessary personal injury or damage to property.

g.  Sheriff Chody violated his own training, supervision, and disciplinary policies and procedures to encourage the use of excessive force and constitutional violations.

h.  Sheriff Chody, and his supervisors, including Cmdr. Deaton and Lt. Luera, failed to timely and properly supervise deputies to conform their conduct while performing for "Live PD" to not violated well-established law, including to not violated citizens' civil rights.

i.  Sheriff Chody's appearance and popularity on "Live PD" encouraged those certain deputies he singled out for selection on the show to use excessive force and to disregard civil rights as a continuing justification to continue appearing on the show and to also become a popular TV celebrity.

j.  Sheriff Chody violated his own hiring policies and practices when he hired the named and unnamed defendants – because they were not qualified – and who were present on May 2, 2019 at the Plaintiff's residence because those individuals had already show that they had an inclination or tendency to violate well-established law and departmental policies and procedures.

k.  Sheriff Chody's leadership of encouraging and not disciplining the named and unnamed defendants for violations of well-established law, tarnished respect for the badge of law enforcement in Williamson County and presented an increased risk of harm to its citizens.

l.  Sheriff Chody's policies and procedures encouraged the falsification of records and for his deputies to be dishonest in their contact with county citizens as evidenced by his repeated failures to suspend or terminate officers for serious infractions including warrantless searches, seizures, damage to property and misuse of SWAT deployment, tactics, equipment, used to escalate violence contrary to proper law enforcement standards that seek to de-escalate such.

m. Sheriff Chody maintained by practice, or by procedure, or by custom inadequate training procedures and policies concerning compliance with well-established law, supervision training to enforce such compliance, training to enforce discipline, de-escalation, and termination for violations of law, including the responsibility to report violations.

n. Sheriff Chody instituted the custom of not turning over body camera evidence, the names of Big Fish cameramen, or other witnesses and evidence gathered at alleged crime scenes, which led to an increased risk of harm to the citizens. The withheld material facts from the District Attorney prevent prosecutions considered to be in the public interest.

o. On April 1, 2021, the current, Sheriff Mike Gleason, has acted in conformity with Sheriff Chody's long-standing policy of obstructing justice by refusing to timely provide and properly answer a request for material evidence about the May 2, 2021 Watsky incident, including those involved, their identities, training, supervision, discipline records, body camera audio and video, and communications about the removal of the capias, as required by statute, i.e., the Texas Public Information Act.

173. The Big Fish contract was used to sustain and further the official policy of reckless disregard created by Sheriff Chody and Williamson County, which is one affirmative act, which is a basis for their culpability.

174. Further, since at least 2017 the official policy of Sheriff Chody and Williamson County to act with deliberate indifference to well-established law was well known and established to constitute the custom that represented Williamson County and its Sheriff's Department policy.

175. That policy was promulgated by and with the deliberate indifference to the known or obvious consequences that constitutional violations would result from widespread and persistent practice of adopting, ratifying, and practices encouraging assaults, battery, warrantless arrests and searches, and violations of civil rights.

176. Despite that Sheriff Chody and Williamson County were aware, from a <u>pattern of conduct arising from their policies and from complaints</u>, internally from employees and externally from the public, and the complaints from the victims of excessive use of force, and the news media's reporting of such incidents, before May 2, 2019, they proceeded with deliberate indifference to not only continue with the Big Fish "Access Agreement" but were deliberately indifference to implementing adequate training, re-training, supervision and discipline, to reduce the risk of harm to the public by de-escalation, replacement of unqualified deputies, and training and enforcement of proper use of force.

177. Sheriff Chody, as well as Williamson County, had available to them the "Live PD" videos of the named and unnamed defendants as well as those deputies that appeared in other episodes before such were aired, and certainly as they aired and after, to make inquiry and to determine that violations of well-established law were occurring.

178. Sheriff Chody was deliberately indifferent to the increased risk of harm to the personal health and safety of the citizens of Williamson County that was created by him and his deputies, named and unnamed, who performed for the contract with "Live PD."

179. Sheriff Chody was deliberately indifferent through WCSO's affirmative actions in creating danger to its citizens, including the Plaintiff, in that the citizens and he could not have otherwise faced such peril. Thus, Sheriff Chody and WCSO failed to protect all county citizens from the danger they created by refusing to engage in proper law enforcement activity.

180. Sheriff Chody, as the chief policymaker, by his conduct, and lack of training, supervision, and discipline, was deliberately indifferent to, and therefore knowingly deviated from the implementation of standard law enforcement procedures that created a culture of violence with the Sheriff's Department, as documented by District Attorney Shawn Dick, newly elected Sheriff Gleason, the news media, and the indictment of Sheriff Chody.

**181. Williamson County's policies were the "moving force" behind the pattern of constitutional violations by WCSO's supervisors and deputies.**

182. The named defendants, Cmdr. Deaton and Lt. Luera, were supervisors, who, by their failure to supervise, congruent with Williamson county's policy of deliberate indifference, ignored constitutional violations of well-established law, which created the moving force behind not preventing harm and injury to the Plaintiff and his property.

183. The unnamed defendants who were present on May 2, 2019, also acted in conformity with Sheriff Chody's authorized custom to escalate the use of force contrary to well-established law when they committed assault and battery of the

Plaintiff and damaged his property, or if not directly involved, they stood by and failed to stop those deputies violating the law.

184. Williamson County, being aware of the increased risk of harm presented by the performance of the Big Fish contract, and therefore, along with the rising pattern of complaints and excessive use of force in the Sheriff's Department, was deliberately indifferent to the risk of harm being created to its citizens by Sheriff Chody's failure to supervise, re-train, or correct the violations of civil rights and well-established law.

185. Sheriff Chody was an unreasonable policymaker because he acted with deliberate indifference to the known and expected consequences of his conduct, policies, and customs he authorized because he never corrected them.

186. When Williamson County finally admitted that it and Sheriff Chody were engaging in the deliberate indifference to the civil rights of others, for which the Big Fish contract constituted an affirmative act of the moving force, along with their customs, policies, practices and procedures, Williamson County terminated the Big Fish contract.

187. Williamson county then sued Sheriff Chody for continuing to create a culture of indifference to the excessive use of force when he separately and without the permission of Williamson County contracted with Big Fish continued to perform in the same manner of deliberate indifference to sustain the culture of violence and excessive use of force and obstruction of justice that presented an increase of risk of harm or injury to Williamson County citizens from continuing constitutional violations.

188. Thus, it was foreseeable and most probable that a Sheriff who would subvert the Williamson County code of ethics to engage in pursuits for personal gain, acting under color of law, and within his scope of his elected employment, would obstruct justice, engage in conflicts of interest, or accept gratuities, would be deliberately indifferent to the risk of harm of deprivation of constitutional rights created by such conduct.

189. THEREFORE, the policies, customs, procedures, as set forth above were a moving force behind Sheriff Chody's and Williamson County's deliberate indifference to the pattern of complaints that constitutional violations would result, and that they knew were resulting because they were being presented to them before Gary Watsky's constitutional deprivations, injuries and taking of property occurred.

190. Thus, the moving force and the deliberate indifference to federally protected rights directly caused Gary Watsky's constitutional deprivations.

## COUNT II
### Supervisory Liability
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983

191. The allegations contained in each of the other paragraphs above are hereby incorporated by reference, as if fully set forth herein, and further alleges as follows:

192. Sheriff Chody signed the Big Fish contract that not only illustrated his culture of indifference but was used in furtherance of his and Williamson County's reckless indifference policy.

193. Sheriff Chody implemented the performance of the Big Fish contract by his orders, directions and supervision of his deputies to find events for filming, such as

the arrest of Asher Watsky that was the direct result of his culture of indifference to well-established law and procedures to make peaceful arrests, particularly for television entertainment.

194. Sheriff Chody knew, either by actual or constructive notice, and was therefore aware from the pattern of victim complaints and news media investigative reporting, that his reward system of gift cards, failure to discipline, and encouragement of the escalation of violence by his deputies when making contact with citizens, would likely result in constitutional deprivations, particularly when they could be planned for the purpose of television entertainment.

195. Sheriff Chody knew and approved of the events to be filmed in advance because he would tweet out messages of the upcoming episode, knowing that he would approve of his deputies using excessive force, departing from the truth about the reason for such escalation of violence, and engaging in constitutional violations to guarantee drama for entertainment purposes.

196. Sheriff Chody knew that for the Big Fish filming to continue, that his performance of the Big Fish contract required him to continue with his policy and custom to authorize, ratify and not discipline for constitutional violation behavior to encourage and in effect guarantee that his deputies would perform at the "creative and logistical" level (i.e., use of SWAT team force) required for the entertainment drama and advertiser ratings.

197. Sheriff Chody's use of force and disregard for the increased risk of harm and injury arising from his performance of the Big Fish contract constituted the

implementation of a custom and policy that was in itself a repudiation of constitutional rights because he encouraged and directed his supervisory deputies, including Cmdr. Deaton and Lt. Luera, to use false pretenses to set up the excessive use of force and warrantless search and seizure of Gary Watsky by detention and the search and destruction of his property solely for television entertainment.

198. But for Sheriff Chody's custom and policy, consistent with the Williamson County policy of reckless disregard, standard law enforcement practice never would have allowed for the pre-planned removal of the capias for Asher Watsky, - and under standard law enforcement practice, there would never have been a warrantless no-knock entry of Gary Watsky's residence, resulting in injury to him and his property.

199. Under the circumstances of the culture of indifference policy to constitutional violations it would be objectively unreasonable for Sheriff Chody to not know in advance of the home-invasion raid planned for Gary Watsky's home for a television event, and therefore because he did not use his supervisory authority to prevent it, he approved it.

200. The number of victim complaints, use of force incident reports, and Sheriff Chody's interference to not discipline for violations of well-established law, showed that he encouraged such violations with rewards and incentives, such as gift cards, "Wilco Badass," identity, and approving of future appearances on the "Live PD" episodes for deputies willing to violate well-established laws.

201. It would be objectively unreasonable for Sheriff Chody to not be aware of the consequences that his culture of indifference was creating – because of the reporting

of injuries and complaints by the news media investigations and the internal whistleblower complaints – that established Sheriff Chody was acting with deliberate indifference to the obvious consequences of his actions when he was repeatedly confronted with a patter of similar constitutional violations due to his and his deputy's continued performance of the Big Fish contract.

202. The culture of deliberate indifference is evidenced in every episode of "Live PD."

203. That the culture of deliberate indifference was in effect is evidenced by the unwanted contacts with its deputies that resulted in complaints from victims such as Javier Ambler's death, and injuries to Scott Lewis, Charles Thornburg, Marquina Gilliam-Hicks, Ramsey Mitchell, Imani Nembhard, and Gary Watsky.

204. Sheriff Chody's deliberate indifference to the constitutional violations being committed by the WCSO pursuant to his unconstitutional customs and policy was encouraged by his direct actions to use rewards and incentives, such as being portrayed as a hero or badass on television for violations of well-established law, that encouraged other deputies to depart from their training and departmental ethics to engage in constitutional violations to be approved to appear in a "Live PD" episode.

205. Sgt. Brogden and deputy Pisa conformed that Sheriff Chody used Cmdr. Deaton to hand out gift cards for the unjustified use of force appearances for entertainment value on "Live PD."

206. Sheriff Chody's encouragement of constitutional violations with rewards and his failure to supervise or discipline for such was the moving force in the warrantless entry and use of excessive force used against Gary Watsky.

207. Cmdr. Deaton acted with deliberate indifference to the constitutional rights of Gary Watsky as a supervisor when he carried out Sheriff Chody's performance of the Big Fish contract by engaging in pre-planning activities, assigning deputies who would use excessive force, and facilitating the removal of the capias that directly resulted in the use of excessive force and the constitutional violation of a no-knock warrantless entry and search of Gary Watsky resulting in his injury and damage to his property.

208. Lt. Luera acted with deliberate indifference to the constitutional rights of Gary Watsky as a supervisor when he used false pretenses to justify the use of excessive force and when he led and ordered deputies to violate well-established law and to use excessive force while committing the constitutional violation of a no-knock warrantless entry and search of Gary Watsky's residence, resulting in his injury and damage to his property.

209. But for Cmdr. Deaton and Lt. Luera's failures to exercise their supervisory duties to comply with well-established law, Gary Watsky would not have been placed at risk for the harm and injury done to him

210. The Watsky raid would never have occurred but for the customs, policies, and deliberate indifference of Sheriff Chody and Williamson County that also resulted in

the use of false pretenses, false narratives, and non-disclosure of facts, all of which was further encouraged by the reward of being on "Live PD."

211. Sheriff Chody's customs and policies acquiesced to by Cmdr. Deaton and Lt. Luera, directly caused the removal of the capias from the view of Judge King and prosecutor McKinnon on May 2, 2019, which non-disclosure was consistent with and done pursuant to such customs, policies, and the pattern of deliberate indifference to violate well-established law, including to justify the excessive use of the force that occurred later that day.

212. The pattern of constitutional deprivations was not isolated, but were often repeated, constant violations, that had become predictable because of the foreseeable consequences of the customs and policies Sheriff Chody and Williamson County allowed when they accommodated Big Fish's being embedded – as a matter of policy – into police work for entertainment value.

213. Sheriff Chody, as the policymaker, acting by and through his supervisors, Cmdr. Deaton and Lt. Luera, required by retaliation or termination that his deputies must follow his polices, customs and procedures, that in turn required that they disregard standard training, and self-supervision, which would therefore not result in their discipline for violations of well-established law.

214. then that custom and practice established a culture of indifference to deprivations of civil liberties committed by them and the WCSO.

215. Upon information and belief, and subject to discovery, Sheriff Chody, as the policymaker interfered or interceded to divert, truncate, or stop any investigations by

his office of professional conduct into his culture of deliberate indifference, customs and policies, including by harassment, retaliation or termination.

216. Because Sheriff Chody's customs and practices were so well established at the administrative and supervisory level, upon information and belief, the newly elected Sheriff had to clean house. Most if not all supervisory deputies had to resign or be terminated – otherwise Sheriff Gleason could not re-establish the trust of the trust of the public.

217. Any reasonable Sheriff or deputy is trained and required to know the conditions of executing a warrantless entry and search require *exigent circumstances* that fall into three categories:

    a. Rendering aid or assistance to persons whom the officers reasonably believe need assistance.

    b. Preventing the destruction of evidence or contraband.

    c. Protecting the officers from persons whom they reasonably believe to be present and armed and dangerous.

218. No reasonable Sheriff or deputy who was present in the courtroom could conclude that Asher Watsky was an immediate threat to anyone or would not comply with any lawful request, prior to the warrantless invasion of his father's home on May 2, 2019.

219. Sheriff Chody and his supervisors, Cmdr. Deaton and Lt. Luera, as well as any unnamed defendant supervisors could not have any objective belief that breaking down the doors to Gary Watsky's home would not violate the well-established law of the Texas Constitution art. I § 17(a) that:

"No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, . . ."

220. These supervisors, Sheriff Chody, Cmdr. Deaton and Lt. Luera knowingly and intentionally deprived Gary Watsky of the rights and privileges secured to him by the Fourth Amendment to the United States Constitution, and the other well-established laws of the United States and the State of Texas to be free from illegal and unreasonable warrantless entry, searches and seizure using unnecessary force.

## COUNT III
### Warrantless entry, search, seizure and excessive use of force pursuant to 42 U.S.C. § 1983 against the Unnamed Defendants.

221. The allegations contained in each of the other paragraphs above are hereby incorporated by reference as if fully set forth herein, and further alleges as follows:

222. Acting under color of law, the Unnamed Defendants' conduct in participating in the Gary Watsky home-invasion, deprived him of the rights and privileges secured to him by the Fourth Amendment to the United States Constitution and the other well-established law of the United States and the State of Texas to be free from illegal and unreasonable warrantless entry, searches and seizure using unnecessary force.

223. On May 2, 2019, there was no need to make a no-knock, flash-banging, excessive use of force SWAT team entry to break down the front and back doors for a warrantless entry into Gary Watsky's home, his seizure for search, and the search of his entire home.

224. Like the similar pattern of conduct involving unfortunate other before him, Gary Watsky had committed no crime, and he was under no articulable suspicion for anything unlawful.

225. Upon information and belief, and subject to discovery, Sheriff Chody, as the policymaker interfered or interceded to divert, truncate or stop any investigations by his office of professional conduct, into his culture of deliberate indifference, customs and policies, including by harassment.

226. Therefore, by this inaction the unnamed Defendants could expect to rely upon the policy that they would not be disciplined for acting contrary to their training, oath of office, and well-established law, for the excessive use of force in making a warrantless entry invasion of Gary Watsky's home.

227. Any reasonable Sheriff or deputy is trained and required to know the conditions for executing a warrantless entry and search require exigent circumstances that fall into three categories:

    a.  Rendering aid or assistance to persons whom the officers reasonably believe need assistance.

    b.  Preventing the destruction of evidence or contraband.

    c.  Protecting the officers from person whom they reasonably believe to be present and armed and dangerous.

228. No reasonable Sheriff or deputy who was present in the courtroom could conclude that Asher Watsky was an immediate threat to anyone or would not comply with any lawful request prior to the warrantless entry of his father's home on May 2, 2019.

229. No reasonable Sheriff or named or unnamed Defendant could have any reason to believe that either Gary Watsky or Asher Watsky was in the immediate need of assistance or needed to be prevented from destroying evidence or contraband, or that the Sheriff and his deputies needed protection from Gary Watsky because he presented any armed and dangerous threat when he was in his home.

230. No reasonable Sheriff or named or unnamed Defendant could have believed there were any facts of exigent circumstances based upon the sum of all the information known to them at the time of entry.

231. It is clearly established law that the warrantless entry into Gary Watsky's home on May 2, 2019, because his doors were destroyed by being battered down, that he was assaulted with flash-bag grenades, that he had guns pointed at him, and likely touching or very close to him, that he was seized at gunpoint for search of his person, and his property was searched by ransacking the entire house, amounts to excessive use of force that no objective reasonable deputy could justify as lawful.

232. The warrantless search of Gary Watsky's home occurred under the direct supervision of Lt. Luera and Cmdr. Deaton, pursuant to Sheriff Chody's and Williamson County's customs and policies and encouragement of using excessive force and constitutional violations when orchestrating and performing for entertainment events for "Live PD."

233. Lt. Luera, a supervisor, directed and was present at the Watsky home-invasion.

234. No unnamed deputy present at the Watsky home-invasion could have reasonably believed that his conduct, or the orders he was given by Lt. Luera, provided any objective reason for him to believe he was not acting in violation of well-established legal rules at that time.

235. Cmdr. Deaton, as the facilitator of Sheriff's Chody's culture of indifference, could not have any objectively reasonable belief that the raid on Gary Watsky's home had any justification considering well-established legal rules, including by his failure to stop it.

236. The unnamed Defendants, whether participating or as bystanders, could not believe his conduct was objectively reasonable considering clearly established legal rules they had to know from their standard training to obtain certification as law enforcement officers.

237. Sheriff Chody and his supervisors, Cmdr. Deaton and Lt. Luera, as well as any unnamed supervisors, could not have any objective belief that breaking down the doors to Gary Watsky's home would not violate the well-established law of the Texas Constitution art. I, § 17(a) that:

> "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, . . ."

238. From the pattern of persistent complaints and news reports, a reasonable jury could find that the unnamed deputies had actual if not constructive notice of the unreasonable risk of harm they were creating because of their following the Sheriff's customs and policies that had created the culture of deliberate indifference that disregarded the excessive risk of harm to Plaintiff's health and safety presented by

them when they violated well-established law, such as for assault, battery, and damage to property, and warrantless search and seizure.

239. The unnamed Defendants knowingly and intentionally deprived Gary Watsky of the rights and privileges secured to him by the Fourth Amendment to the United States Constitution and the other well-established law of the United States and the State of Texas to be free from illegal and unreasonable warrantless entry, searches, and seizures using unnecessary force.

240. Because Williamson County and its Sheriff, Mike Gleason, has the records to determine who was present, who planned, participated in which unlawful conduct, or benefitted therefrom, Plaintiff reserves the right to amend and clarify this Complaint after discovery by writ of mandamus against Williamson County.

## COUNT IV.
### Plaintiff's Damages

241. The Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully repeated herein.

242. **Punitive damages.** When viewed objectively from the standpoint of Sheriff Chody, Cmdr. Deaton, Lt. Luera and the unnamed Defendants, their conduct created and involved an unreasonable and extreme degree of risk of harm and injury considering the probability and magnitude of the activates to the citizens of Williamson County.

243. Plaintiff, Gary Watsky, claims that the conduct of Sheriff Chody, Cmdr. Deaton, and Lt. Luera, as well as likely other unnamed Defendant's conduct

constitutes malice, evil intent, reckless disregard of the truth, or reckless or callous indifference to Plaintiff's constitutionally protected rights.

244. **As a direct, proximate, and producing cause,** and the intentional, egregious, malicious conduct by these defendants, the Plaintiff is entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court and constitutionally permitted.

245. **Compensatory Damages.** The Plaintiff repeats and realleges each allegation contained in the above paragraphs as if fully repeated herein.

246. The unconstitutional policies, procedures and customs also created an increased danger of risk of harm and injury to the Plaintiff, therefore his injuries were a foreseeable event.

247. The Plaintiff's injuries and property damage was directly and proximately caused by these Defendant's use of excessive and unreasonable force against the Plaintiff that showed a policy of deliberate indifference by their constitutional violation of committing a warrantless entry and search resulting in property being destroyed or damaged.

248. As a result, the Plaintiff is entitled to recover all actual damages allowed by law.

1. As a direct and proximate result of the constitutional violations made the basis of this lawsuit, the Plaintiff has suffered panic attacks and continuing anxiety, humiliation, mental anguish, pain and suffering lessening his enjoyment of life as a direct result of the Defendants' actions for which the

Plaintiff has sought psychological treatment from near the time of the event for the trauma caused by Defendants.

2.  As a direct and proximate result of the occurrences made, the basis of this lawsuit, the Plaintiff, Gary Watsky, respectfully requests, pursuant to 42 U.S.C. § 1983 that he recover for his suffering and award of damage for the following:

> a.  Conscious pain and suffering and mental anguish.
>
> b.  Humiliation
>
> c.  Embarrassment
>
> d.  Property damage
>
> e.  Cost of health services for psychological treatment of his trauma, past, present and future.

3.  Punitive damages against the individual Defendants.

4.  The Plaintiff requests his attorney's fees, and reasonable and necessary costs and expenses, including expert fees, pursuant to 42 U.S.C. § 1988.

## COUNT V.
## Jury Trial Request

249.  The Plaintiff demands a trial by jury.

## PRAYER

The Plaintiff respectfully requests that judgment be rendered against the Defendants for an amount within the Court's jurisdiction. The Plaintiff prays for all other relief he is entitled to, and for which he is justly entitled by these proceedings.

Respectfully submitted,

/s/ Lamar Treadwell
Lamar D. Treadwell, Lead Trial Counsel
TBN: 20205000
1308 E. Common St., Suite 205
New Braunfels, Texas 78132
505/ 660-0602 Cell
505/ 213-0094 E-Fax
Lamar@treadwelltriallaw.com


**SMITH and VINSON LAW FIRM**
/s/ Jarrod Smith
Jarrod L. Smith,
jarrod@smithandvinson.com
TBN: 24094095
/s/ J. Bradley Vinson
J. Bradley Vinson,
brad@smithandvinson.com
TBN: 241100021
1411 West Avenue, #124
Austin, Texas 78701
PH: (512) 368-9044